Good morning. May it please the Court, my name is Suzanne Lee Elliott. I'm here on behalf of Svetlana Yim. May it please the Court and Counsel, I would like to concentrate my argument today on the sufficiency of the evidence to convict Ms. Yim of engaging in a drug conspiracy with her husband. Of course, it's a tough burden to bear in this little case. You know, you may as well. I've been doing this for 30 years, Your Honor. I'm always representing defendants. I always have the awful burden of proof on appeal. It's rarely in my favor. But sufficiency of evidence in a criminal case is probably the most difficult thing. I'm not saying you shouldn't. Well, Adipa might be a little bit more difficult. But yes, here the familiar standard is the Jackson one. Whether there was sufficient evidence beyond a reasonable doubt and could a rational jury find each of those elements beyond a reasonable doubt. And you're focusing on, there are a couple of arguments you're making today. Which one are you focusing on right now? This is, I think, the logical way to look at it. For Ms. Yim to be guilty of the conspiracy, she has to have both knowledge of one of the objects of the conspiracy, the drug dealing, the illegal object. And she has to affirmatively agree to assist in moving that conspiracy forward. As to the money laundering, the knowledge element is somewhat the same. She has to know that the, this is, as Judge Peckman said, dirty money, that she is spending that in some way is now concealing it from the government or concealing that underlying drug conspiracy. The, if you find that she did not have knowledge of her husband's drug dealing in the conspiracy count, it seems to me it naturally follows then that she did not know what she was spending was dirty money. In the money laundering counts, you also have to, I would argue, have to look at the fact that the government lumped all of the family members into the spending accounts. And presumed, and told the jury that they could presume that all of the money that was being spent, both that Lana knew about and knew that it was the proceeds of drug activity. There's no jewel in this case, right? No. Jewel. No. I understand what you're saying. You mean, in what sense, Your Honor? Jewel, yes, there's a jewel. No one raised that in the lower court, so I don't think it exists in this case. This is a deliberate failure to know. Oh. There's no. No, no one, no one argued. Well. I mean, she's there. Two sides of a coin, I guess. She's there. She's involved in the family's financial dealings. She's shuttling money. She's, you know, there's all this property is being bought, jewelry, cars, all of that. And she has no idea where the money's coming from. You know, it's sort of a. It is both a benefit to me in terms of the argument in this case that this couple were married and a detriment. One, I mean, obviously if you're married to a drug dealer and if you have absolutely nothing to do with their business or spending any of their money, you are not a co-conspirator. Yeah. I mean, if she's off in the Riviera spending the husband's money. And not knowing where it came from. Well, no. I'm not, you know. You know, she's traveling the world. You know, and then she says, look, I don't know. I mean, there's a guy. He's a businessman. I don't know where the money comes from. But she's not. She's right there. She's deeply involved in the stuff. She signs notes. She signs loans. She signs. I mean, she does all sorts of stuff. She does actually engage in the real estate transactions. Well, why can't a jeweler, when he hears all this evidence, realize, hang on, she knew. This was, you know. Well, it was entirely circumstantial. So, they would have to look at all of this. So, circumstantial evidence is the best kind of evidence. Because, as you know, witnesses never remember anything correctly. Well, in this case, well, for example, take the government's witness, Sue Yim, who they did not charge, who simply, the government was willing to accept that she would take $100,000 checks from her mother, deposit them in her account, and then later write them back to her mother or her brother, having no knowledge and never asking any questions about where they came from. Ms. Yim and Ms. Yim. It may mean they were gullible. It may mean they were generous. But I don't see how that helps your client, honey. Because they called Sue Yim to the stand, and they called Dane Semple to the stand, and neither one of them testified that Ms. Yim knew of the drug dealing that her husband was engaged in or that she knew the source of the funds. How do you get around the aunt, Drew's aunt who testified, Yim told her that Yim was thinking about divorcing Drew because he was dealing drugs? That was, yes. It's inconvenience to your argument. It is an inconvenience, but it's not very compelling evidence when the aunt had a difficult time remembering it and did not state when Svetlana understood. And, Jackson, it doesn't have to be compelling. The question is, engaging in all intendance in favor of the prosecution, can a juror use that as a rational basis to say Yim knew what she was doing? She may. I think a rational juror could find that she had a suspicion about what her husband was up to, but I don't believe one could use that.  You're changing the evidence. As I understand the evidence, the aunt said, she told me she was thinking of divorcing her husband because he was dealing in drugs. That's not a suspicion. Okay. But she didn't say, and I have affirmatively agreed to help him in that business. And that's the missing point here. Well, you can't get everything out of one witness. Yes. So even if she had knowledge, where's the affirmative agreement? But isn't that exactly the kind of gap that jurors can fill? She knows he's dealing in drugs. She's involved in this shuffling of money and this buying and this signing of notes and all those things. And she must have agreed. I mean, she's doing stuff that's helping this business, which if you believe the aunt, which I guess the jury could have, she knows it's an illegal business. Well, I think the jury had some problem with that because they did not find Miss Yim guilty of the promotional prong of money laundry, in that she was actually helping him make money for his drug business. Could have been sympathy. I mean, wives in that situation are in a difficult spot.  I'm not. I'm not. I'm not. But, you know, the jury decides to give a pass on one. Well, is that implausible? I don't. Yes. I don't think juries are uncommonly kind, I guess I would say. But it's not implausible. Have you been on a jury? I've been kicked off. Not me. I never get kicked off. In this case, I think Judge Peckman correctly observed that the government, of course, had the poll cameras out and they listened to at least 3,400 telephone calls. And in her view, it was clear that they were living relatively separate lives. Miss Yim came and went with the children and came and went and did her activities in terms of the family, and Mr. Yim came and went in his own vehicle. They never saw drugs in Miss Yim's vehicle. They never saw her accepting large amounts of cash. There was, as I say, there's no willful blindness instruction in this case. Even the government agreed that all of the drugs and the phones and everything were in one small room of the house. My problem with accepting the government's argument here is that anyone who is married to someone who is involved in an illegal activity under the government's theory is then guilty as a co-conspirator if they bring any of the money that they have obtained from their illegal activities into the house. So, for example, if your husband's an investment banker with C-Bank, he said, I had this great tip off the street. We just made a million bucks. Let's go. Why don't you go buy yourself? Why don't you go buy yourself? A small bill, right? No one said, no one had ever observed her with a small bill. In fact, money, much of the money that she had that she was using to buy new houses was out of flipped houses that they bought before, recalling that, in fact, they were buying these houses at a time when they could hold them for a few months, flip them, make a gain, and buy a new house. So, at any rate, if you know that this, I don't think it has to be in cash. I think if you know that it's an ill-gotten gain and you are now spending it on a new vehicle. It's not beyond belief that on Wall Street you might get a bag of cash these days. But I think that's the problem with the government's theory here and that they had no direct evidence that Ms. Yim was anything other than a wife spending her husband's money. And on that basis, you cannot convict her either of the conspiracy or of the money laundering. Okay. Thank you. We'll hear from the government. May it please the Court. I'm Jared Patterson for the United States. Good morning. To go directly to the last point that the defense counsel made, it wasn't simply a matter of Svetlana Yim enjoying the benefits of the drug business that her husband operated. She, in fact, was actively involved in all of the efforts to launder the funds. In fact, what the record showed is that she was the one who had the financial expertise, the real estate expertise, in order to pull this off. There was no evidence that her husband was particularly adept at finance. I'm sure pull what off? Pull off the scheme to launder the funds to continue the drug business. There was a laundering, right? Yes. There's no evidence that she was involved in the actual drug dealing. That's correct, Your Honor. We have to infer that she knows that her husband is dealing drugs, and she is helping him by helping to launder the money. That's correct, Your Honor. That's the government's theory. Yes, Your Honor. And the point is that it was only Svetlana Yim who had the knowledge and the expertise to even launder the funds in the first instance. There was no evidence that Drew Yim, in contrast, was skilled enough, had the experience to know how to launder the funds. For example, Svetlana Yim. Let's say she is involved in laundering, right? And she knows that something fishy is going on. He can't be making all this money in a legitimate business, and there would be no need to launder it, right? But she doesn't know what the husband is doing, that it's drugs. Would she still be... And let's say there is no evidence that she knows it's drugs. Would that still be supportable on a theory of conspiracy to drug dealing? Well, not as the government charges in this case, no, because... And you've got three separate counts, right? You've got drug dealing, you've got your laundering, and you've got your mail fraud. Correct. I'm just talking about the drug dealing. She has to know it's drugs. I mean, let's say, for example, let's just speculate. I'm making this up. But let's say she knows, she thinks the husband is involved in some legitimate business, but she is laundering the money so they avoid paying taxes. So she thinks she's helping tax fraud. And it turns out, no, it turns out it's actually a drug conspiracy. If those were the undisputed facts, she wouldn't be guilty of drug conspiracy, right? I would agree with that, Your Honor. Even though she thinks she's doing something illegal, even though she thinks she's joining a conspiracy of sorts, right? But she wouldn't be guilty of drug conspiracy. So what evidence is there here that she knew it was a drug conspiracy? Well, as Your Honor has already indicated, she told Drew Yim's aunt, Lynn Wilson. There's the evidence from the aunt. Is there anything else? Well, in terms of direct evidence with her admitting that she knew it was a drug conspiracy. You know, lawyers love to use the word direct and circumstantial. It doesn't matter. Evidence is evidence. Is there any evidence? Is there any evidence other than the aunt's testimony, which may be enough? But I just would like to know, is there anything more? Was there anything other than the aunt's testimony that supports the view that she knew it was a drug conspiracy, as opposed to some other kind of illegal conspiracy? Well, there's a lot of evidence in the record, Your Honor. One was in June of 2005, DEA agents came to Svetlana Yim's home. They told her that they were investigating Drew Yim because he was a drug dealer. They then removed a tracker from Drew Yim's car that they had installed in his car as part of this investigation. Svetlana Yim stood there and watched the agents as they removed the tracker. She even got Drew Yim on the phone for them because they wanted to talk to him about his involvement in drug trafficking and to, in part, to seek his cooperation. So from that moment, she is at least on notice that the DEA thinks that he is a drug dealer and that the DEA has been, took the steps to investigate him and put a tracker on his car. Did she make any statements to the investigators in 2005 acknowledging that her husband was a drug dealer? No, Your Honor. I think so. In addition, Drew Yim in this case, and I'm... The government's suspicion can't hardly be evidence, right, of what she knows. It doesn't prove that she knew. It might explain why she's telling the aunt she wants to divorce him. I mean, you know, thinking, you know, I don't want to be involved with a guy that the federal government thinks is a drug dealer. It doesn't prove that she knew this conversation back in 2004. It does not prove that. But it certainly sets up the suspicion in her mind, at the very least, that Drew Yim was, in fact, a drug dealer. But then we go on with the drug transactions that Drew Yim engaged in in this case. And just during the 16-month investigation in this case, he was involved in over 25 different drug transactions, involving over 135 kilograms of cocaine, over $1.5 million in cash. And what the evidence in trial showed is that he conducted all of this business at his home. He used his home as the stash house. He used his home as the place where he stored his cash. He did not set up a stash house at another location, like many drug dealers do. He used his home as the hub of the drug trafficking activity. So when law enforcement executed a search warrant at the residence in May of 2011, they found everything you'd expect to find. They found drugs. They found cash. They found drug paraphernalia. They found 18 separate cell phones lying on the floor being charged. They found heat sealers. They found duct tape. They found baking soda. They found glass vials. They found all the indicia of being a drug dealer right there in the home, just steps away from the front door of the home. So even if Drew Yim wanted to hide this from his wife, from the defendant, it would be virtually impossible to do so just based on the volume of drug trafficking that was occurring at the home. But the evidence at trial showed that, in fact, he was... What drugs? He was... As far as the evidence is concerned. He was dealing virtually everything. Cocaine, ecstasy, marijuana were his three main drugs. And then he also dealt a modest amount of meth. But he didn't manufacture the meth. Not to my knowledge. He did have baking soda. Meth labs have a... I'm told. I mean, I've had trials. Meth labs have a smell. They do have a smell. And from what we know, he was not manufacturing meth at the home. But what... There's no evidence as to whether any of these drugs emitted scent or anything. Well, certainly marijuana emitted scent. And there was testimony at trial that one of his co-conspirators, Mike Harmon, was struck by the smell of marijuana in the home and even said to Drury M., you need to air this place out because it smells like marijuana. There was also baking soda found in this room that I just described. Baking soda is used, of course, to convert cocaine into crack cocaine. Don't know if... There's no direct evidence Drury M. did that in this case. But even if Drury M. wanted to hide... Maybe he was making cookies. True. But it was found next to the heat sealer, the money counter, the glass vials, the duct tape, the baggies. So the inference would certainly be he was using that in furtherance of the drug business. But he made no attempt to hide his drug business from his wife. He kept his drug phones not just in that room that I just described, but upstairs in the main level of the house where the kitchen was. He kept several cell phones scattered on the kitchen counter, on the dining room table. He talked about how to conduct drug transactions in front of the defendant. He had a particular conversation with Mike Harmon when they discussed how to use drug phones effectively, how to talk in code, how to never say people's names or even places, to always talk in code. He had drug traffickers drop off drugs at his house. And Mike Harmon testified that he walked in with 32 kilograms of cocaine, walked five seconds down the hallway on the first floor and dropped the cocaine off next to a pool table on that first floor and went upstairs and had a snack for about a half an hour. Now, Svetlana Yem was not home at this time, but Drew Yem was. And Drew Yem told him where to put the cocaine. If Drew Yem was at all concerned about his wife coming home and finding the cocaine, he would have told Mike Harmon to hide it or to do something else with it. But instead, Mike Harmon simply walked in and put the cocaine down essentially in the main room of that first floor before he went upstairs to have a snack. So there was no real effort on his part to hide this from his wife. So then the question becomes, assuming that the defendant knew that her husband was involved in drug trafficking, then the question is, well, what did she do in order to actively promote it or to work in furtherance of the conspiracy? And there's five different main things that she and her husband did, as outlined in the briefs. First, she used friends and family members to hold onto properties and to hold onto cars essentially as nominees to keep them out of her name. She used family members to simply hold onto money, to cash, and a lot of that money eventually worked its way back to Drew and Svetlana Yem. So as one example, $464,000 in cash was deposited into the account of Drew Yem's mom and sister. $165,000 in cash was given to Svetlana Yem's parents to build some condos. And then at the end of the day, over $425,000 of that money was then transferred back to Drew and Svetlana Yem. It's just textbook money laundering. They used a bogus front company to launder the funds to legitimize the source of the income. That's referred to as snag, slay, and release. They used 17 different bank accounts to conceal the different sources of money that they had. And of those 17 bank accounts, Svetlana Yem was the signatory in all but five of them. And they used money orders as a way to both conceal the source of the funds and to avoid reporting requirements. And of the over 400 money orders that were introduced in this trial, Svetlana Yem signed over half of them in her own name. But in addition, based on the handwriting exemplars of Svetlana Yem, she actually signed other people's names on those money orders as well. There's one particular incident in December of 2008 where somebody, most likely Svetlana, although we can't prove that, somebody bought 22 separate money orders at three different Safeways, driving up and down West Seattle in order to go to three different Safeways to buy these money orders. All of these money orders were signed by Svetlana Yem. And they totaled $11,000. And the logical reason why someone would have done that is because if they purchased more than $10,000, then Safeway would have reported that to the government. But by buying 22 money orders at three separate Safeways, they avoid the reporting requirements. So based on all these acts of money laundering, then we look to the factors that this Court has looked to in determining whether someone has, in fact, joined the conspiracy. And the three things that this Court has cited is, first, the defendant's stake in the outcome of the conspiracy. Second, the defendant's role in the conspiracy and how important her role was to further its purpose. And third, the closeness of the relationship between the defendant and the main drug trafficker. And based on that, it's clear the defendant had a huge stake in this outcome, or excuse me, in this conspiracy. She relied on it for her livelihood, for the diamond rings, for the boats, for the cars, for the house itself. Second, as outlined in the brief, the defendant had a central role in carrying out the money laundering. Indeed, she was the only one who had the knowledge and the skills to do so. And third, the closeness of the relationship between the defendant and her husband. Certainly they had a rocky marriage at times, but they also had a relatively lengthy marriage and had four children together. There's really no doubt about that they had a close relationship and that she would have known virtually everything that he was doing, particularly when he was doing it out of the family home. So unless there's further discussion. Thank you. Thank you. I think you have some time left. Thank you, Your Honor. I would like to start where the government left off. Yes, they had a close relationship. They were married. An innocent explanation. Yes, she had a stake in the outcome of her husband's money because she had four children to support. There's no evidence here, however, that she agreed to do anything to support that business. She did do stuff to support the business. There's no doubt about that. The question is whether she knew. And this is what we focused on to begin with. And the government has now come up with more stuff. There is a fact that this was going on in the house. And large quantities of drugs going through the house and drug paraphernalia kind of stuff, which why couldn't the reasonable jury infer that if she's living there, she would have seen it and she would have been aware. She would have smelled it. She would have seen it. She would have been aware of it. The jury found, well, the drugs and paraphernalia that were found at the time of the search were in one specific area of the house, in a closet under the stairs. And at that point, at least, the officers didn't say there was any smell. The jury found her guilty, however. What about that statement about you need to be out of the house because it smells so much of marijuana? That was Mr. Harmon's statement. Mr. Harmon had, Judge Peckman didn't find him very believable, and there was no indication that the... This was a jury trial. That's true. So what we do is we look at the evidence and see if there's a reason the jury had believed it. I don't have any trouble at all believing that if you bring in large quantities of marijuana, the stuff smells. I don't think there's any... And I don't know about other drugs, but I have a hard time... I would certainly be willing to believe that large quantities of any kind of drugs emit a scent. The jury here found her guilty of a conspiracy that involved 500 grams or more of a substance containing methamphetamine. So they focused their attention not on the drugs that were in the house, but on this particular fact, because that was the fact that was necessary for the government to argue that she would ordinarily be in prison for 10 years. In this case, Judge Peckman found that she qualified for the safety valve and only gave her five. But I don't think there was any testimony that 500 grams of methamphetamine went through the house. There's no direct evidence of that. I'm sorry, that's a different argument. That is a... So now, for purposes of this argument, we say, yes, she knows there was a drug conspiracy going on, but there's no evidence that... Or 500 grams. 500 grams. That's a new argument. I hadn't focused on that. So are you claiming that there's not enough evidence of that? Well, there's evidence. There's clearly evidence that Drew was dealing with large quantities of methamphetamine. If you're focusing on what did she know about the methamphetamine... Well, okay, but that is... If she knows there's a drug conspiracy going on, she doesn't have to know about every ounce. She does not have to know, no. All the government has to prove is that she knows there's a drug conspiracy and that sometime during the course of the conspiracy, 500 grams or more of methamphetamine was moved, whether she knew about it or not, right? I think that's true, yes. Okay. So the fact that she doesn't know or they haven't proved that she knew about the 500 grams doesn't help you at all once we get past the point that she knows there's a drug conspiracy. And she could learn there's a drug conspiracy going on because she smells the marijuana, she sees the baking soda, you know, all the paraphernalia that opposing counsel has mentioned, right? Those are in the House, yes. But my focus is this. I don't believe there were huge... There were some drugs and some paraphernalia found in the House at the time of the arrest, but it's not as though they found 500 grams of methamphetamine or this large quantity of cocaine. But there's no stash house. So whatever the husband moves, he moves through the House. There is no stash house. He's using the House as a base of operations. That's the government's theory, and they do see him coming and going. After he has engaged in transactions. But Deng Senpo's house, according to the government, was also a stash house. That was some place where they were going to put drugs. I'd just like to say I don't think that Ms. also Drew Yim was as ineffectual as the government might make out. He was the only person who delivered large quantities of cash to his mother and his sister, and there was absolutely no testimony that the mother and the sister and Ms. Yim were working in concert. No one ever saw the delivery of this cash, but it clearly happened at some point. Sue Yim saw the checks. Mr. Yim bought Seahawks tickets with cash year after year after year, and he bought both of the boats with cash. So it's not as if she was the only person who knew how to launder money in this case. She did have a real estate license, and she did work with her family. What was the 22 money on this? There was no proof that Ms. Yim bought those. She signed those to pay bills. She bought things at Costco. She bought things at I think the other place was Safeway. But the case law is clear that simply purchasing small amounts or it's not a money spending statute. It's a money laundering statute. So you can spend funds, and that's not the question. The question is where did the funds come from? The government's theory is this was structuring. This wasn't just sort of spending money. This was 22 money orders bought at three separate stores designed to stay under the $10,000. What they argued is that was proof of knowledge because no one would actually engage in paying bills or things like that or accepting cash unless one were involved in a drug case. But, in fact, much of the cash that they accepted, at least her parents accepted, was rent from this apartment building that they had. The government quantified anything that went into the account as drug money, not rent. Their experts said that. So there were other ways in which this family was obtaining cash. They had this condo or apartment building. Thank you. You're welcome. Case is argued with central notes. We'll go on to the last case on the calendar, Takaka v. Hartford Comprehensive Employment Benefits Service Fund. Good morning, Your Honor. My name is Steve Krafchick, and I represent Debbie Takada. I understood we had 20 minutes. Is that incorrect? Fifteen. Fifteen. That's awesome. Thank you. This is a case that is really, I think, governed by prior precedent of Sapon and Boonton, which I know the Court is well familiar with. In this case, the initial denial rests primarily on a statement by Dr. Kakumbo where she checks a box, yes, and says, I agree that the claimant can work. And then there's vocational information. Yeah, but there's more than just check a box. She also said that she needs to get rest periods. So it's not like she just checks something. I mean, she's obviously... It's not clean, but it's not as reasoned as the residual capacity questionnaires for chronic fatigue and fibromyalgia that she submitted with the appeal. And in those... Your problem is that she was caught on tape doing stuff she said she couldn't do. Well, I don't... That sort of changes, reminds me a bit of a movie, The Production Cookie. Let me address that directly. Dr. Kakumbo said she couldn't work two consecutive days at ER 195 and said that she could not work eight hours. If you look at the surveillance, the most... She never reaches eight hours of activity in any of the surveillance. Whether she can kick or instruct a class or do that really is immaterial. If the limits that Dr. Kakumbo set out... Well, it's not immaterial because it matters just whether or not she can get another job in the economy. And when she got the benefits, she claimed she couldn't lift 15 pounds or push or pull. She couldn't stand for more than... And, you know, she's doing all the stuff which is wholly inconsistent with what she claimed when she got the benefits. I understand, Your Honor. But in this particular case, when she's doing the work at the taekwondo dojo where her husband owned and she's performing these activities, there's nothing inconsistent with being able to do those activities with either fibromyalgia or chronic fatigue syndrome which are her diagnoses. The question for work... She's doing it for seven or eight hours a day, two days running? No, she's not doing it for seven or eight hours. She's doing it for six hours or seven hours max, and that's total activity and that is not the time that she's spending in surveillance at the teaching. She's only teaching for a couple hours a day. But she's spending six or seven hours a day in the martial arts studio and she's not able to do a sedentary light job? No, she is not spending six or seven hours a day in the martial arts studio. I thought that's what you just said. No. I said, first of all, Dr. Kakumba said she can't work an eight-hour day and she can't work more than two consecutive days. If Dr. Kakumba's right, she can't work in any occupation because all of the occupations set out would require somebody to show up more than two consecutive days and at least eight hours a day. The surveillance only went for two hours a day at any time, and only parts of that time was she involved in teaching and doing kicking and the other stuff. But the reality is that in this particular case, in the initial denial, they looked at Dr. Kakumba and Dr. Kakumba's statements that the court has will. They looked at a vocational analysis and they said that. So his attorney at the time, Mr. Whitlow, said, okay, I've got to find out if Dr. Kakumba really means what she said and I need to see about the vocational aspects. So what he does is he presents vocational information and he presents the residual functional capacity evaluations. I submit to the court that those residual functional capacity evaluations are much more specific to fibromyalgia and chronic fatigue syndrome than the agreement with the statement that went to him first. And if you look at that statement that Dr. Kakumba made, you have to look at what he was told in the letter. And the letter tells him that Ms. Takata said that she couldn't work more than two hours per day. But on ER 217, where they look at the average day and the typical day and the good day and the bad day, it's clear that there are differences in what she can do on any given day. And in the surveillance that they did, they never went past the limits that Dr. Kakumba said that Ms. Takata could meet. So you think the surveillance was ineffective because it didn't surveil her for 48 hours? It didn't surveil her for more than two days. And it didn't surveil her, it didn't catch her doing activity on any of the four days that they did it for more than seven hours. And that activity was not all at the dojo. Some of it was driving, running errands, and the like. At the dojo she- She said she couldn't do it when she got the benefits. Well, the benefits were paid for 16 years, so the condition may have changed over that time. And earlier when she said she could do these things, maybe she could or couldn't. But if you look at what's happening at the specific time, which is in the investigator's evaluation of her, which was at- that's Craig Bean's evaluation, it's cited in the materials. The investigator finds that she says that she cannot- she has differences between a typical day and an average day, average good day. An average day, a typical good day, and a typical bad day. Counsel, you wouldn't disagree that if her condition improved, that the insurer would be entitled to eliminate benefits. No, of course not. But you have to look at what evidence they had and what the judge did. And in this case, I believe that the initial denial never alerted Mr. Whitlow that they were going to evaluate the appeal for objective evidence. May I ask you, is there- what objective evidence would you have presented had you been told or had she been told? It's interesting. That not- she was told in the letter that she had to present medical rationale for the restrictions and limitations. Correct. Right? Correct. Then on the final denial, they said you didn't present objective evidence. Your best position, I would take it, is that she was told one thing, you have to present medical rationale. And she was denied on another ground, objective evidence. That's exactly right. And what you say is, well, if I'd been told about the objective evidence, I would have made a different showing than when I was told about medical rationale. My question to you, what objective evidence is there of fibromyalgia or chronic fatigue syndrome? There is objective evidence of fatigue being disabling that can be found on a physical capacity evaluation performed on a cardiopulmonary exercise test. That's in the literature. If I had been representing Ms. Takada back when Mr. Whitlow was, regardless of what they said- If you believe her, right? What? If you believe her. Well, I would question, but I would send her for a CPAT, a cardiopulmonary exercise test. But the question was, you didn't present objective evidence. Okay? And I think the question I heard Judge Baer ask is, what objective evidence would you present? And your answer, as I heard it, was, here is all this stuff, but it's all based on her statements. You misunderstand, Your Honor. Okay. There is a physical capacity test, which is a cardiopulmonary exercise test. Actually, they do it on a stationary bike. And they take somebody to their anaerobic threshold and see where it relates to people who can function without problems. And they also can test cognitive problems with neuropsych evaluations. But it also depends on her saying I can do it, if she decides to say I can't do it. No, no. The anaerobic threshold you can't fake. It's something that a runner doing a marathon, whoops, hits a wall. And that's their anaerobic threshold. When you're working beyond your anaerobic capacity, you have very little energy left there. And you'll note in the transcript that you can't exceed it. Or if you just say I can't pedal anymore, you can't pedal, you know, there's no way of telling. No, it's a physiological finding. The anaerobic threshold is when you can't do anymore. And they can see it because they measure the oxygen intake. They measure other metabolic markers when they're doing this. And this is a test that if they had alerted Mr. Whitlow, he could have obtained. He also could have obtained. But it's your response that it was the obligation of the insurer to tell the attorney which test to obtain? Well, the defense counsel for Hartford in argument said we could have gotten a physical capacity test or we could have gotten a neuropsych test. Well, if the attorney knows that, why wouldn't Hartford know that? And if the rules are supposed to be to the benefit of the beneficiary and you have to disclose the information necessary to perfect your claim under the regulations, then they should tell them not only the objective evidence, but why don't you get a physical capacity test or a neuropsych test if you're complaining of fatigue and cognitive problems? Is there a case that says that the insurer has to be that specific in terms of telling the claimant what documentation has to be presented? What case authority are you relying upon to support your argument? Well, I'd start with Booten and Safon. Well, they're not that specific. They're not saying what you're arguing for here, that the insurer has to delineate precisely and specifically which tests have to be presented. I know there's a case cited in my materials and I don't have it at the top of my mind, but I know that it's one of the progeny of Safon. Do you have your brief there? Pardon? Would you like your brief to look at? Yeah, I did. I did. May I help you? There you go. You want the gray brief too? There's a case that begins with a D. I'm just blanking on the name. But if it's really crucial to your case, it would seem that you would have that readily handy. It's Bolyanska v. Epicentric. What's the citation for that? It's a Lexis site, 207 U.S. District Lexis, 81208. There might be a formal site now. Okay. And where is that from? What court? If you want to know, we can. Yeah, it doesn't say, but it says it's insufficient to simply inform a claimant that there is no objective evidence to support disability claim without specifying what type of objective evidence would substantiate the claim. Northern District of California. Okay. So basically, we're looking at an initial denial that doesn't say anything about objective evidence. The attorney responds with residual functional capacity questionnaires, which I think would need a medical rationale because here are the problems that people with fibromyalgia have, here are the problems people with chronic fatigue has, here are her problems, here's what I think. Concluding with she wouldn't be able to work more than two days in a row and she wouldn't be able to work more than eight hours in a day. And if you look at the initial denial, which is 203 to 207, there's no mention of any kind of objective information or the inadequacy of subjective evidence type of information a doctor relies on in history. Do we have any cases, counsel, that say that cardiopulmonary tests are objective evidence of chronic fatigue syndrome or of fibromyalgia? And what's your basis for saying that? You know, I've been doing this for 20 years. I represent predominantly people with chronic fatigue syndrome and fibromyalgia. It's never been a case that has to be litigated up because one of the... The answer is no. Correct. Correct. Not that I'm aware of. Is there anything in your brief which tells us that a cardiopulmonary test is objective evidence that establishes a diagnosis of CFS or fibromyalgia? It doesn't establish the diagnosis, but it's consistent with the complaints of fatigue. So what it establishes is that the fatigue that somebody is... Consistent doesn't mean very much... What it means is it documents the fatigue and shows a physiological basis for the fatigue. In other words, if somebody is pedaling on a bike, they hit their anaerobic threshold at a level 20, that's very low, and they have to get... Normal people could do it at 60 or 70 or whatever. I made those numbers up, but it's by example. And the neuropsychological test, that is... It's a well-known test. It's a battery. It's a two-day battery or a one-day battery with cognitive tests to test the cognitive ability and would get at the cognitive problem. It requires a response of the patient to establish a response? A neuropsychological test is based on the patient's responses... There's no objective measures as in a cardiogram? Correct. The physical capacity test that I'm talking about, the CPAT, which Ms. Takata should get and we would present if we were given the opportunity, would probably document that she had physiological fatigue. And that would answer the question of the objective evidence. And we didn't get that chance. Thank you. You have negative conduct. Okay. May it please the Court? I'm Michael Riley, representing the appellees today. Mr. Riley, direct your argument, would you please, telling us why you think that the letter which said present medical rationale is consistent with your final denial letter saying you haven't presented any objective evidence. Why didn't you ask for objective evidence in the prior denial? Those two things seem inconsistent to me. Okay. Your Honor, this is a unique case where at the initial claim denial phase, you had Dr. Kakumba, the treater, concurring with the assessment that she could work. There was also a review of all the records, and all of those records in there indicated that based upon the surveillance and the inconsistencies that this Court has already noted between the surveillance and her actual interview, that she could work. Then things changed because it went to the appeal level. And at that point, they submitted two items. They submitted Dr. Gorman's opinion, just that she had met with Ms. Takada. And then second, they submitted the treater, Dr. Kakumba's statement. And this is where it's now raised for the first time, where Dr. Kakumba says, hey, that prior opinion that I gave you was wrong. And there's no real medical analysis behind it other than Dr. Kakumba says, after one or two more visits, she knows Ms. Takada better. But there was no medical analysis, there was no objectivity offered at that point as to how this change occurred. Well, for instance, she filled out two questionnaires, one on fibromyalgia, another one was on chronic fatigue syndrome. And she found some response as to point muscle tenderness. Isn't that objective evidence? Well, no, Your Honor, because all of that's based on self-report. The questionnaire is a self-report. Well, if the doctor is poking you and you have pain in certain places and not in other places, is that self-report when you rinse? Well, Your Honor, we've never challenged the diagnosis of fibromyalgia or chronic fatigue. We have challenged where was the objective data of impairment. The questionnaire did not. There wasn't any bend over and see if you can touch your toe, your shoes, let's see what you can do backwards, what's your range of motion. That's what you're talking about. That's correct, Your Honor. There was no objective data of that. And I think the important part that this court needs to know is that Mr. Kravchuk keeps indicating that there was no opportunity to offer objective evidence, but the court in Abadie and Safon indicated there is the pressure cooker relief valve. And that is if you think that the appeal denial letter surprised you and said you added some new requirement of objective data, and the Safon case at 872 says, agreeing with Abadie, that you could submit a declaration at trial for the court to consider. And at trial, Mr. Kravchuk specifically got up and said, had he known that there was a need for objective data of impairment, his statement at the transcript at 54 said he would have submitted a functional capacities assessment, that's the objective data I think you're asking about now, or a neuropsych evaluation. So from April of 2008, when the appeal denial comes out, to September of 2012, there wasn't a surprise here. Mr. Kravchuk, or prior counsel, knew that there was a requirement for objective data, and they could have submitted it. And the court actually said in her decision, Judge Peterson's 34-page opinion, she mentioned again the Safon pressure relief valve argument and said if Takada had argued that such evidence actually existed, the court may have allowed her to present it. Her position is even though the first letter denial was on medical rationale and the ultimate denial was on lack of objective evidence, between that denial and the decision of the district court, there were four years in which time Mr. Kravchuk could have done what he just talked about, presented a pulmonary stress test analysis in an affidavit and submitted it to the district court. That would not have been outside the required record which had been built in the claim denial. Well, it would have been accepted under the Avadi case and the Safon case. This court has indicated when you feel like you're surprised, and that's what their argument is here, you then can submit this evidence. And in the Avadi case, the trial court rejected the declaration that was submitting objective evidence, the new evidence, and the Avadi Ninth Circuit reverses it. And in the Safon case, they said that seems to be the right rationale and the right way to go. So you're right, Your Honor. That's exactly the issue. They had four years, five years to get this information. We had three continuances in this case. The case was set for a Rule 52 or a Rule 56 motion, so certainly the counsel knew we're either going to go for a trial on the record that would be submitted or a motion for summary judgment. So that would be my answer on that. I don't think there was objective evidence of impairment. As to the scope of review of Hartford, whether it was independent or whether actually the determination was made by Battelle, could you address whether the trial court made an error there in disregarding the letters, which are I think in October 2007, indicating or reciting that the decision will be made by Battelle. That is explained by a misreading of the agreement, the unsigned agreement which said Battelle would make the determination. But then the later agreement saying Hartford would make the determination. But on a motion of summary judgment, couldn't a rational trial of facts come to the conclusion that the letters just blurted out the truth, that it really would be Battelle who made the determination and not Hartford? No, Your Honor. And the reason is there was uncontested declarations that were submitted in the record, specifically at SER 195 to 198, where the declarations were not contested here. They said we made a clerical error and they explained it. So I don't think there was an issue of fact because the letters are there, yes, but then it's uncontested that it was a clerical error and it was explained. Well, how could the plaintiff contest the claim of clerical error? Doesn't that go to the credibility of the person who's saying it's a clerical error? Well, no, Your Honor. There's no dispute of fact here. There's no – certainly Mr. Cratchit could have done discovery on this if he had wanted. There was no deposition. As a matter of fact, the discovery was allowed at this point. That's correct. Again, I think the bottom line is that coming into this, and maybe this is where I should address two things, which was we didn't have a summary judgment. It was contested here by the statements of fact or the legal briefing, and we believe that they didn't really raise these arguments effectively at trial anyway, and any of this now would be a new argument of the Ninth Circuit. But the next argument I think that's really most important is what is your standard of review here? And there's two different abuse of discretion standards of review. When you don't have a conflict, and I believe, again, there isn't any issue of fact, that Hartford made the decision and Battelle is the funder of the benefit. So when you don't have any conflict at all, you get the pure, good old-fashioned abuse of discretion standard that says you can affirm if there is any reasonable basis. This is not a case where you have a conflict and where I think Judge Kleinfeld and Saloma describes the abuse of discretion standard in a conflict case as the skeptical arbitrary and capricious standard of review. This is just a pure is there any reasonable basis to support the decision, and we think there is that. Getting back to I think something else that was raised was the differences in the surveillance, which can't be understated here. When you have a case where it's a self-reported limitations of restrictions and limitations, the credibility of that claimant has got to be pretty important. And the surveillance versus the interview showed dramatic differences. For example, she says she couldn't do grocery shopping without her husband. That was the record at 137. But the surveillance showed that she went to grocery several times. She picked up large big bottles of seven bottles of different kinds of water. She says she never taught taekwondo. That's what she said in the interview. She denied teaching classes. That's the record at SCR 137. But this record showed she was teaching. Not only was she teaching, she was doing high kicks. She was holding boards so the students could actually break the boards using roundhouse kicks. So this is someone who maybe she can't do full-time taekwondo, but certainly a sedentary job would be one that she could do. Again, when you're looking at her credibility. She said that she had good days and bad days, and maybe you got her surveilled on a good day and then she had a bad day. Well, that is what they say. But we'll also say this. In the interview, she said she only could stand an hour and that she only was functional two hours a day. That's what she said in the interview. She didn't say in that interview, I have two good days and then I'm out for many days. She took a very black-and-white position in that interview, saying she had only two hours of functionality, which wasn't proven. And, again, that's why I think the importance comes back to two things, which was after they appeal, Hartford didn't rest on the records. They went and had a rheumatologist look at all the records again, looked at Dr. Kukumba's refinement of her opinions, and actually made their own assessments. So this is another rheumatologist looking at this information. When you're looking at the good old-fashioned arbitrary and capricious, this is a very good basis to affirm you have a rheumatologist saying that she could work. Let me ask you about another issue that's raised. Mrs. Takata did procure a Social Security Disability Award, the standards of which are, I think to a degree, more strict than the standards under Hartford. If she could get a Social Security Award, shouldn't she be able to get a Hartford Award? And, secondly, didn't the Hartford disregard the Social Security Award and not give it the importance which the Montour case says we should give it? Okay, so two responses to that, Your Honor. Number one, I don't believe that because someone gets Social Security Disability, they're entitled to disability under the policy. There are different standards here. There are different considerations and different eligibility. Having said that, what we do know is this in this record. She did get Social Security Disability Awarded in 1991. That was 16 years go by. I think Judge Rawlinson had also raised the point, can she get better? And, actually, the record at SCR 129 to 133 that said after 1991, by 2005, she says her fatigue and muscle pain is not as severe and her lab exams were normal. So by 2005, we know she's improved, even by her own admission. But then what we have is in 2003, Social Security looks at her again and they affirm the disability finding. The Montour case does say that when you're looking at the Social Security decision, you should look at what they say and make the medical analysis. And I think the context of both the initial denial and the appeal denial both very understandably state why the Social Security determination wasn't valid anymore, at least for them. Because you had all these new records and new information that they didn't have in 1991 and certainly didn't have in 2003. Including the surveillance from 2007. Exactly. You have her in 2005 saying she's doing better. You have the surveillance. And then you have when Chow did an independent medical examination where Dr. Chow said, this is record at 163, SCR 163, that it's unremarkable. She's very fit in tone. There isn't anything that indicates her restrictions and limitations. You had Nurse Watson's review. You had Dr. Kukumba initially saying that it's the treater. She's okay. She can go to work. And then you have Houston, the eye doctor, knocking out her argument of tunnel vision because Houston says there aren't any vision problems. That's SCR at 80 and 81. Then you have Dr. Burns who does this final record review. So there was a lot of things that the totality of this letter shows Social Security didn't have. So I think we did comply with Montour. When you're looking at medical analysis and rationale, then in this case she ‑‑ Is she still denying Social Security benefits? I'm sorry? Is she still denying Social Security benefits? I believe she is. Yes, Your Honor. Has there been no move to reconsider it? Not that I'm aware of. That's not in the record here for sure. So in the end, we think that Judge Peterson did an extraordinarily good job of looking at this case by not having the legal briefing on the plaintiff's side, relying totally on an oral argument to look through the facts and analysis. She spent 34 pages doing analysis. And in the end, if you think any letter was insignificant or not meeting any regulation, they had that SAFON pressure cooker relief valve. They could have submitted that information. The judge said she would have considered it, and it wasn't submitted. We ask you to affirm the trial court. Thank you. Your Honor's time. We'll give you a minute for a buzzer if you wish to take it. Could you please address that last argument? Why didn't you submit from 2008 to 2012 a declaration under the SAFON pressure cooker? I didn't represent Ms. Takata. I know, but that doesn't make any difference, does it? Somebody did. They didn't know about it. They didn't know to do it, would be my assumption, because if I get it, I handle a lot of problems. I want to cut your argument, but she didn't have a chance to. If we have law that says she can present it in district court, then it's not done. But if he doesn't know that that evidence could be existed, he couldn't know that he didn't present it. Well, that's between your client and her former lawyer, isn't it? If she has a right to do it under our law and she doesn't do it, she no longer has a claim that she was denied an opportunity to present evidence. The denial happens in 2007. So if you look at what Hartford had based on information in 2007, they had their surveillance, not more than six hours a day of activity. Is your client still drawing social security? I believe so, yes. And she hasn't put out this evidence to the administration to give any consideration, I guess. Well, why would she? To be honest, perhaps? No, because if what Dr. Kakumba has said, that she can't work more than two consecutive days and she can't work eight hours in a day, then there's no job that defendants have listed in any of their listings that don't require somebody to work more than two days in a row and work at least eight hours a day consecutively. The government might well decide that's the case, but the fair thing would be for her to present this new evidence and have the government reconsider it. Anyway, that's another case for another day. Yeah, the fair thing would be to give us a chance to present the evidence. That's what we're asking for. Thank you. Okay. Case decided with fair submit. We are adjourned. All rise. This court is adjourned. Thank you. Thank you. Thank you.  Thank you. Thank you. Thank you. Thank you. All right. Do you want to take these two back and then we can just... Oh, yeah. Okay. Will you guys have boxes going out? Okay.
judges: Kozinski, Rawlinson, Bea